# W. R. HALL GRAIN COMPANY, v. LOUISVILLE & NASHVILLE RAILROAD COMPANY, Appellant.

**St. Louis Court of Appeals, May 3, 1910.**

1. **COMMON CARRIERS: Delay in Transportation: Pleading: Action in Tort.** A petition in an action by a shipper against a carrier, which alleges that the carrier received certain corn for shipment, and agreed well and safely to carry it to destination and deliver it in as good condition as when received, and that, in violation of its agreement and in disregard of its duties, it so negligently conducted itself as to cause damage to the property, in that it negligently delayed transportation and delivery after arrival at destination, states a cause of action in tort and not in contract, the averment that defendant agreed well and safely to carry the corn to destination and deliver it in as good condition as when received being intended as matter of inducement and to show defendant undertook with plaintiff to act as a common carrier, thus serving as a basis for essential averments showing it violated the duties imposed on it as a common carrier.

2. ———: ———: ———: **Variance Between Pleading and Proof.** The variance between a petition, in an action by a shipper against a carrier, which alleges that the carrier agreed to deliver at designated places to third persons, and the proof, which shows that the bills of lading named the shipper as consignee and contained directions to notify the third persons, is immaterial, as the carrier undertook to turn the freight over at destination to the third persons, on their presenting the bills of lading showing they were the persons authorized to take charge of the shipments.

3. ———: ———: **Rule of Terminal Carrier for Precedence in Handling Cars: Proximate Cause: Question of Fact.** Where a carrier of corn for delivery to an elevator for drying, negligently delayed the transportation, and thereby caused the cars to lose the precedence they would have enjoyed if carried promptly, under a rule providing for the sending of cars to the elevator in the order of their arrival, the question of liability for injury to the corn, in consequence of its late arrival at the elevator, was one of fact, on it being assumed the rule afforded a valid excuse for failure to deliver promptly.

4. ———: ———: **Change of Climate Causing Damage: No Defense.** Where, in an action against a carrier of corn for delivery to an elevator for drying, the evidence showed the corn would not have spoiled if it had been turned into the elevator on arrival, the carrier could not relieve itself from liability on the ground the corn spoiled in consequence of a change of climate.

5. ———: **Rule of Terminal Company for Precedence in Handling Cars: Does not Relieve Carrier from Liability.** A carrier had an arrangement with an elevator company by which it turned into the elevator for storing and drying any grain that arrived in its yards. It was the rule of the railroad to turn into the elevator such cars in the order of their arrival in the yards. The elevator was not a party to prescribing this rule, nor had it agreed to be bound by it. A shipper who delivered corn to the carrier for delivery at the elevator for drying had no knowledge of this rule. The carrier was negligent in delaying the transportation of the corn, and in delivering the same after arrival to the elevator, so that the corn spoiled. *Held,* that the carrier was liable for the injuries sustained, because it was bound to deliver the corn in a reasonable time, and where the consignee called for the same within a reasonable time, notifying the carrier that the corn was shipped to be dried and required immediate handling, the refusal to deliver because there were other car loads of grain that had precedence under its rule did not relieve it from liability.

6. ———: ———: **Failure to Present Bill of Lading.** A carrier delaying the delivery of freight may not excuse the delay on the ground that the bills of lading were not presented, where it did not decline to deliver on that ground.

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench,* Judge.

AFFIRMED.

*Bryan & Christie* and *H. R. Small* for appellant.

(1) The finding and verdict and judgment are for the plaintiff on each of the seven counts alleged in plaintiff's amended petition, although there was a failure of proof upon each of the causes of action alleged in each of said counts of plaintiff's amended petition. Ingwerson v. Railroad, 205 Mo. 328. (2) Disregarding the allegations in the first five counts of plaintiff's amended

petition, plaintiff's evidence conclusively showed no right to recover on any theory, pleaded or unpleaded: First, because by such evidence it was shown that the corn was uninjured when it arrived at Nashville and when notice of arrival to the notified party was given. Second, because by such evidence the damage to the corn was shown to have taken place at Nashville and was due to the fact that it was brought from a northern to a southern climate by plaintiff with the certain consequence that it would germinate as it and thousands of other cars did during the notably hot, wet spring of 1907. Freeman v. Railroad, 118 Mo. App. 526, 533. Third, because after notice of arrival it was defendant's duty to deliver only in accordance with the bill of lading direction of plaintiff to the holder of the bill of lading on its surrender, and in case the holder failed to surrender the bill of lading for the corn, the duty remained in defendant as a warehouseman to use reasonable care to hold or store the grain for the account of the owner, and because by plaintiff's own evidence it was shown that plaintiff did not surrender the bill of lading for the ten cars of corn destined to Nashville until one month after notice of arrival had been given, and because because during that month, by plaintiff's own evidence, defendant, as a warehouseman, fully performed its duty. Lyons v. Railroad, 119 N. Y. S. 703; F. H. Smith Co. v. Railroad, 122 S. W. 342. Fourth, because by plaintiff's own evidence plaintiff negligently failed under the adverse atmospheric and congested traffic conditions at Nashville to take charge of the corn after notice of arrival had been given and so contributed to cause the injury to the corn, and so is barred from recovery. Hardin Grain Co. v. Railroad, 134 Mo. App. 681. Fifth, because defendant, at common law or by contract, either as a carrier or as a warehouseman, is not held to an insurable liability for the consequences of delay. The liability is for negligence only in case of delay. Thompson on Neg., sec. 5451. (3) Even if the evidence under

the first five counts disclosed a right in plaintiff to re-
cover, but not the right claimed in the amended petition,
plaintiff cannot recover.  Plaintiff cannot sue on one
cause of action and recover on another.  Ingwerson v.
Railroad, 205 Mo. 328.  (4)  So confusing is the amend-
ed petition as to the theory of plaintiff that the trial
court treats the suit as in contract, while the plaintiff
treats it as in tort.  For this reason a new trial should
have been granted.  Pipe Co. v. Railroad, 137 Mo. 479.
(5)  The bill of lading contract proven was a contract
to carry only over defendant's own lines.  Nenno v. Rail-
road, 105 Mo. App. 540, and cases there cited; Railroad
v. Stone (Tenn.), 105 Am. St. Rep. 955; Myrick v.
Railroad, 107 U. S. 102; Grain & Elevator Co. v. Rail-
road, 138 Mo. 658.  A railroad company is only bound,
in the absence of a special contract, to safely carry over
its own road and safely deliver to the next connecting
carrier.  Grain & Elevator Co. v. Railroad, 138 Mo.
658; Myrick v. Railroad, 107 U. S. 102; 4 Elliott on
Railroads, sec. 1433; Hutchinson on Carriers (3 Ed.),
sec. 233.  Defendant is alleged and shown to be the
initial carrier and other unnamed carriers are alleged to
be connecting carriers, who complete the carriage to
Athens.  The proof wholly fails to show that the car
of corn referred to in the sixth count was damaged.

*R. P. & C. B. Williams* for respondent.

(1)  At the time the shipments in question were
received, the defendant knew of the congested condition
in the yards at Nashville, and plaintiff had no knowledge
of such conditions.  Under such circumstances, the de-
fendant cannot set up such conditions as a ground for
non-liability.  Grain Co. v. Wabash, 114 Mo. App. 496;
2 Hutchinson on Carriers, sec. 496, and  cases  cited;
Schwab v. Railroad, 13 Mo. App. 151.  The rule declared
by the court in instruction 5 as to the measure of dam-
ages in this case is the correct rule.  That is to say, the

measure of recovery is the difference between the market value of the corn, kiln dried, at the time same should have been dried by said elevator company, and the market value of said corn at the time the same was actually dried by said elevator company, with 6 per cent interest on the said amount, and such other damages as have naturally and proximately resulted from the injury. 3 Hutchinson on Carriers, sec. 1362; Matney v. Railroad, 75 Mo. App. 235; Shelby v. Railroad, 77 Mo. App. 211; Matney v. Railroad, 75 Mo. App. 233; Heil v. Railroad, 16 Mo. App. 363. (2) Upon the question of value, evidence of actual sales of the same kind and quality of property as that in question is admissible. 1 Elliott on Evidence, sec. 182, and cases cited; Maffett v. Hereford, 132 Mo. 518; Sinclair v. M., K. & T., 70 Mo. App. 596, 16 Cyc. 1141; Rickey v. Tenbrook, 63 Mo. 563. (3) The defendant's duty as a common carrier was not ended when it carried the shipments to Nashville, Tenn., and notified the Nashville Warehouse Elevator Company, but such duty continued until the shipments were delivered on the tracks of the elevator company. 4 Elliott on Railroads, sec. 1518. (4) The evidence shows that the other seven cars which went along with the shipments in question, and which reached Nashville at about the same time as the shipments in question, were delivered on time and promptly dried by the elevator company. (5) The defendants seem to have overlooked the point that the relation between the shipper and the carrier is always contractual. Under the authorities in this State, plaintiff's petition proceeds upon the theory of an action *ex delicto* for the defendant's breach of duty arising out of its common law liability. Heil v. Railroad, 16 Mo. App. 363; 3 Hutchinson on Carriers, secs. 1333, 1351. (6) The fact that the plaintiff says in its petition that defendant "agreed" to carry the property to destination, did not make the action one on a contract, and the introduction of the bills of lading by the plaintiff did not convert the action into one on a contract. The bills of

lading were offered simply to show the receipt of the property by the defendant. Heil v. Railroad, 16 Mo. App. 363; 3 Hutchinson on Carriers, sec. 1335; (7) There is no variance between the proof and the allegations of the petition, but even if it should be held that there was a variance, the same was waived by the defendant and the question cannot be raised under our statutes, sections 665 and 656, after verdict. (8) The initial carrier cannot exempt itself as to interstate shipments from its common law liability by contract or otherwise, and this law is binding upon the state courts; and in this case the initial carrier is liable as to the Athens, Georgia, shipment. Sec. 20 of the Interstate Commerce Act; Smeltzer v. Railroad, 168 Fed. 420 and 158 Fed. 649; Railroad v. Crenshaw, 63 S. E. 865; Railroad v. Grayson, 115 S. W. 933. (9) There as no consideration for the stipulation in the bills of lading that the shipments were at "the risk of the owner and subject to delay." Phoenix v. Railroad, 101 Mo. App. 453; Connelly v. Railroad, 113 S. W. 233.

GOODE, J.—The plaintiff is a corporation engaged in the grain business in the city of St. Louis, Missouri, and defendant is a common carrier with a line of railroad extending from the city of East St. Louis, Illinois, to Nashville, Tennessee. The Nashville Warehouse & Elevator Company is a corporation engaged in handling corn and other grains in the city of Nashville, drying, storing, or doing whatever customers request to improve or preserve them. From the twenty-third to the twenty-eighth of March, inclusive, plaintiff shipped ten carloads of corn from East St. Louis over defendant's line to Nashville, Tennessee, consigned to plaintiff at destination, with a direction in the bills of lading to notify said elevator company of the arrival of the cars. Plaintiff had bought this corn on the St. Louis market, whither it had been shipped from northern points, mainly Omaha, Nebraska,

over the Chicago, Burlington & Quincy Railroad to East St. Louis, where plaintiff had it run through an elevator three times to clean it of dirt, dry and prepare it for shipment to southern markets. The corn was graded No. 4, there being three grades, two, three and four, which are based, in some measure, on whether the corn is yellow or white and the quantity of dirt mixed with it, but largely, too, on the quantity of moisture it contains. Experts testified it is possible to raise No. 4 corn to No. 3 grade and even to No. 2, by a process of drying which will take sufficient moisture out of it. Plaintiff wished to have this corn dried again in Nashville by the Nashville Elevator Company before it was sent into the southern markets—wished to have this done both to prevent the corn from spoiling before it was sold, and to raise the grade. Therefore plaintiff intended to send it to Nashville in the cars of the Chicago, Burlington & Quincy Railroad in which it had been brought to East St. Louis; intended after it had been cleaned at the elevator in East St. Louis, to reload it on those cars and send it to Nashville to the Nashville Elevator Company. When first requested, the Burlington Company refused to permit its cars to go south over defendant's line, and would not agree they might until a promise in writing had been obtained from an official of defendant guaranteeing the prompt return of the cars to the Burlington Company. An officer of plaintiff negotiated this arrangement and in the course of the negotiation informed defendant's officer with whom he dealt, the grain was to be sent to Nashville to be dried. With this information defendant accepted the cars, issued bills of lading for them to plaintiff which named plaintiff as consignee at Nashville and contained a direction to notify the elevator company on arrival of the cars. The schedule time from East St. Louis to Nashville is eighteen hours, but the usual time of transit of such freight is from two to three days. Two of the cars reached Nashville in three days, five of them in four days, one in five

days, one in eight days and one in ten days, if we accept as the true dates of arrival the dates when defendant notified the elevator company the cars had arrived. There is a terminal railroad association in Nashville which hauls over different tracks cars coming in over defendant's and other roads, and there are various tracks in the yards of said association, among them one or more tracks to the elevator of the Nashville Warehouse and Elevator Company. The custom of delivery of cars of grain intended to be handled by the Elevator Company, was for the terminal company to run them on the track leading to said elevator and leave them there to be unloaded by the Elevator Company. There is no contention of non-liability on the part of defendant based upon the theory that whatever delay in delivery occurred, was the fault of the Terminal Association, and not of defendant. In every instance the Elevator Company notified defendant to have the cars in question set on the proper track to be unloaded into the elevator on the days the defendant gave notice of the. arrival of the cars; but in every instance defendant delayed doing this for a period ranging from fifteen to twenty days; that is to say, the cars were not put in reach of the Elevator Company to be unloaded into its elevator and dried, until after the middle of April, though they all arrived on days running from March 30th to April 6th. Before the Elevator Company received the corn it had germinated and rotted so as to be unfit to be · dried. Moreover it had "caked," it having been shipped in sacks and on account of the heat and moisture in it had formed into a compact mass in the cars so that the time required to unload a car was from four to six hours, instead of the usual time, thirty minutes; and, of course, the cost of unloading was much heavier than usual. The corn was kept in the elevator for a period of from eighty to ninety days at heavy expense to plaintiff for handling and storage and was afterwards sold for thirty-nine cents a bushel; whereas

under prompt shipment and delivery to the Elevator Company, it would have brought from fifty to fifty-five cents a bushel. Moreover it lost in weight after it was heated in the elevator 69,120 pounds, which was more than double the normal loss in the weight of corn dried before deterioration. The petition contains seven counts, of which the first one is to recover for the loss on a car shipped March 23d, the loss demanded being for unusual diminution in weight, for excessive charges plaintiff was compelled to pay for drying the corn in consequence of its deterioration and for the diminished price received when it was sold. The second count is like the first, save that it asked damages on six cars shipped March 25th. The third count asked damages on a car shipped March 27th, the fourth and fifth asked damages on two cars shipped March 28th, and the seventh count asked damages for the expense of a journey by plaintiff's officer to Nashville to look after shipments and the efforts made to diminish the loss as much as possible. These damages were laid at $100. The following table shows in the first column the number of cars, in the second dates of shipment, in the third dates when defendant reported to the Elevator Company the cars had arrived, in the fourth dates when the Elevator Company ordered them in—that is, set on the elevator track, and in the fifth dates when the cars were set on said track and the corn unloaded into the elevator.

Hall Grain Co. v. Railroad.

| Car No. | Shipped | Arrival Reported | Ordered In | Rec'd in Elevator |
|---|---|---|---|---|
| 34350 Exchange No. 90173 | March 23 | March 30 | March 30 | April 18 |
| 25976 | March 25 | March 30 | March 30 | April 19 |
| 29466 | March 25 | March 30 | March 30 | April 18 |
| 22906 | March 25 | March 30 | March 30 | April 18 |
| 25869 | March 25 | March 30 | March 30 | April 20 |
| 32468 | March 25 | March 29 | March 29 | April 18 |
| 28699 | March 25 | March 30 | March 30 | April 18 |
| 18689 Exchange No. 4594 | March 27 | April 6 | April 6 | April 20 |
| 43124 | March 28 | April 1 | April 1 | April 19 |
| 20848 | March 28 | April 1 | April 1 | April 19 |

The two instances in which the words "Exchange No." appear in the first column, refer to a change of cars, the corn having been unloaded at Nashville by defendant from the cars in which it was carried there, into other cars and the number of the latter reported to the elevator company.

On March 15th plaintiff shipped over defendant's line a carload of corn consigned to itself at Athens, Georgia, with instructions to notify the Arnold Grocery Company at that point. This car did not arrive in Athens until April 2d, though the usual time of transit was from five to six days, and when it arrived it was spoilt and had to be sold at a sacrifice. The sixth count of the petition is to recover for the damages to that corn, The first five counts which deal with the ten cars shipped to Nashville, alleged in substance, plaintiff delivered the cars to defendant at East St. Louis, and defendant received them for shipment for charges to be paid, and agreed well and safely to carry the cars from East St. Louis to Nashville "and at the latter place to deliver

the same to the Nashville Warehouse & Elevator Company in as good condition as when received from plaintiff as aforesaid, said corn shipped for drying and storing of which defendant had notice. But plaintiff says that in violation of its said agreement, and in total disregard of its duties as a common carrier as aforesaid, it so carelessly and negligently conducted itself in the premises that said property was greatly damaged in this: That by reason of the negligent and unreasonable delay in the transit of said car from East St. Louis, Illinois, to Nashville, Tennessee, and the negligent and unreasonable delay in delivering said car after its arrival at destination, the said corn became hot, and when the same was delivered, said corn was greatly damaged and reduced in value." The sixth count is substantially in the same form and deals with the Athens, Georgia, shipment. The answer set up four defenses: First a general denial; second, that the damage to all the corn mentioned in the petition, if any occurred, was due to its condition before, during and after transportation, its inherent defects, its disposition to germinate and spoil, and to the influence of the heat and moisture it was subjected to through no fault of defendant; third, that whatever damage happened was caused by the negligence of plaintiff directly contributing thereto, without alleging in what particular plaintiff was negligent; fourth, that whatever damage the corn mentioned in the first five counts of the petition sustained, happened after transportation of the corn was completed, after it was delivered at Nashville, and after prompt notice of arrival had been given and was due to plaintiff's not promptly unloading the corn after arrival and caring for it. Proceeding further to state the facts, we observe, the testimony went to prove corn shipped in the condition that in question was when it left the elevator in East St. Louis, would, under the usual weather conditions in the spring, remain sound without further handling for about eight days, perhaps ten. From March 26th to April 30th, there was a con-

gestion of cars on the tracks in the yards of the Terminal Association in Nashville and great quantities of corn and other grain spoiled in the cars on the tracks in consequence of inability to get it unloaded promptly into elevators to be dried. Grain intended by the Terminal Company to be turned into the Nashville Elevator Company's warehouse accumulated on the tracks in quantities ranging from twenty-three cars in the latter part of March, to one hundred and one cars on April 30th, which was the maximum accumulation. Immediate transfer of the cars in question to the track of the elevator company so the corn could be dried was solicited of defendant personally by the officers of the elevator company, and said officers informed defendant's officers the elevator company had promised prompt handling. When those cars began to arrive in the yards at Nashville, the elevator company's officials at once demanded of defendant and, it seems too of the Terminal Association, that these cars be put on the elevator track ahead of other cars. This demand was made both verbally and in writing and defendant was notified as follows: "This business was solicited before any heated corn arrived. We (*i. e.* the Elevator Company) reserved the right to order in ahead." Just what that expression means is not cleared up entirely by the evidence; that is to say, it is not clear whether the Elevator Company made an agreement with the plaintiff to order the cars in on the elevator track ahead of other cars, or whether it had an understanding with defendant or the Terminal Association that it might. It is proved, however, that on the arrival of the cars, the president of the Elevator Company told defendant and also the Superintendent of the Terminal Association, the Elevator Company had solicited the business on a promise the corn would be promptly dried, requested the cars to be put on the elevator track at once, and the Superintendent of Terminals promised to do everything he could to have this done. As one of the main defenses in the case

is that defendant was justified in not delivering promptly to the Elevator Company because of the great congestion in the yards, and a rule of the Terminal Association that cars of grain to be stored or dried in the elevator should be put on the elevator track in the order of their arrival, it is necessary to notice the evidence at this point more minutely. There was a general arrangement between the Nashville Elevator Company, the defendant railway company and the Nashville, Chattanooga & St. Louis Railway Company, to this effect: When cars of grain reached the Nashville yards over the lines of either company and were "not taken up by the consignee within a certain period," the grain was stored with said Elevator Company on what was called the "Railroad Account." The Elevator Company had no contract with the owner of the grain and did not know him, but if the grain was not promptly called for by the consignee, said Elevator Company would receive it from the railroad company which had brought it in, with a view to storing, drying or otherwise preserving it. The railroad companies we may say had a contract with the Elevator Company by which, without any special arrangement in each case, they might send the latter for handling and storage, cars of grain not promptly called for by the consignees. Just what was the relation in which the Terminal Association stood to defendant is not made clear; but as well as we can gather, the Terminal Association was a party to the arrangement and worked by a rule that it would set cars of grain which required attention on the elevator track in the order of their arrival in the yards. There is no proof this rule was any part of the contract between the railway companies and the elevator company, but the latter had acquiesced in it; at least never before had asked that it be disregarded. In the present case it made such a request and the Superintendent of Terminals agreed to endeavor to comply with the request by putting the cars in question ahead of other cars; and,

it seems, he did give them a certain degree of preference, but not sufficient to prevent the corn from spoiling before delivery. The evidence shows seven other cars of corn were shipped from East St. Louis at the same time those in controversy were, and by prompt delivery to the Elevator Company were prevented from spoiling. It needs further to be stated the bills of lading contain these words: "Owner's Risk; subject to delay;" also "Perishable," "Rush." The court below found as a fact no consideration in the way of a reduced rate or otherwise was allowed for the corn being carried 'at plaintiff's risk. As regards the cause of the failure of the railroad company to deliver the cars to the Elevator Company, the evidence is not altogether uniform. The testimony of defendant's yardmaster at Nashville tends to prove defendant was not at all to blame, but could have delivered the cars to the Elevator Company if said company had been prepared to receive and handle the grain, and was prevented from doing so by the accumulation of other cars of corn which had come in ahead and by the rule ought to be first taken care of by the Elevator Company. On the contrary the assistant secretary of the Elevator Company gave testimony conducing to prove defendant or the Terminal Association was not as expeditious as was possible in putting the cars on the elevator track. He said defendant sometimes put them in as fast as the Elevator Company could handle them, but there were times when the tracks were empty (meaning the elevator tracks) because the yards were congested and they (meaning defendant) could not use the switches in the terminals, that this was due to the immense number of cars in part, and also to the movement of passenger and freight trains on the main tracks of defendant company and of the Nashville, Chattanooga & St. Louis Railway Company. That is to say, the congestion of cars on the main tracks prevented the cars of grain destined to the elevator from being set on the elevator tracks, because it was necessary for the cars of

grain to go over the main tracks to reach the elevator tracks, and passenger and freight trains so obstructed the main tracks the elevator tracks could not be reached. The evidence showed without contradiction the corn in the cars was known to be rotting on the tracks before it was delivered, and if it had been promptly delivered, it would have been saved. The Elevator Company did not present bills of lading to defendant for plaintiff's cars until May 5th, but the proof is there was an arrangement between defendant and the Elevator Company by which the latter could get cars of grain without presenting bills of lading and hold the grain in the elevator subject to defendant's charges until these had been paid. The court found the issues for plaintiff on all the counts of the petition, the total judgment being for $2682.56, of which $41 was allowed on the seventh count for the expense plaintiff was forced to incur in looking after the corn and $439.19, on the sixth count for the loss on the corn shipped to Athens, Georgia. The remainder of the judgment was for the difference in the price received for the corn mentioned in the first five counts and what it would have brought if undeteriorated. From this judgment the defendant appealed.

We have stated this case fully, because we think the facts fully stated show there is no merit in the errors assigned. The first assignment is, as we understand it, that in the first five counts the declaration is *ex contractu*, whereas plaintiff was allowed to recover in tort. This position is untenable. The gravamen of the petition in those five counts is in tort for negligent delay in carrying the corn and delivering it after it arrived at destination. The averment that defendant agreed well and safely to carry the corn to Nashville and deliver it there to the Elevator Company in as good condition as when received was intended as matter of inducement and to show defendant undertook with plaintiff to act as a common carrier of plaintiff's grain, thus serving as a basis for essential averments showing defendant violated

the duties imposed on it by law as a common carrier. [Heil v. Railroad, 16 Mo. App. 363; 3 Hutchinson, Carriers, sections 1333, 1351.]

The petition and proof are further questioned because the former alleges defendant agreed to deliver at Nashville to the Nashville Elevator Company and at Athens, Georgia, to the Arnold Grocery Company, whereas the bills of lading show the undertaking was to deliver to plaintiff at both places. Hence it is contended a failure of proof occurred. As we have stated, the bills of lading named plaintiff as consignee of all the cars and contained directions to notify the elevator company at Nashville and the grocery company at Athens; and whatever variance there is between the petition and proof in this regard, is only apparent and wholly immaterial. What the bills of lading meant and defendant understood them to mean, was the property should be turned over at destination to the parties to be notified, if the latter had the bills of lading showing they were the persons authorized to take charge of the shipments.

It is argued no ground for a verdict in plaintiff's favor was established because the delay in transit had nothing to do with the damage to the corn, which damage occurred after arrival at destination and in consequence of the grain having been shipped from a northern to a southern climate during the spring of the year. We do not assent to the argument made throughout defendant's brief, that the delay in transit had nothing to do with the spoiling of the corn. In view of the supposed rule at Nashville to send cars to the elevator in the order of their arrival, it may have had much to do with the damage. If the cars in question had reached destination in due time, the inference might be drawn they would have arrived sooner and have been entitled to precedence under that rule in respect of delivery on the elevator track over cars which were given the preference. Hence if we were to grant the rule afforded a

valid excuse for defendant's failure to deliver the cars promptly, it would not follow necessarily no liability on the part of defendant was shown, since it was for the trier of the fact to say whether the delay in transit caused plaintiff's cars to lose the precedence which otherwise they would have enjoyed. The proposition that the corn spoiled in consequence of a change of climate, scarcely merits attention, for all the evidence shows it would not have spoiled if it had been turned into the elevator upon arrival. The case of Hardin Grain Co. v. Railroad, 134 Mo. App. 681, 114 S. W. 1117, to which we are cited in support of this proposition, bears no resemblance to the one at bar. In said case the damage to the corn resulted from the omission of the shipper's agent at destination to unload it promptly, said agent having ignored for a month a notice given by the railroad company of the car's arrival. If the elevator company at Nashville had been so remiss, there would be merit in defendant's argument; but said company ordered the cars set on its tracks the day they arrived, and defendant held them more than two weeks while it knew the grain in them was rotting.

The main contention is, defendant should be excused because the congestion in the yards prevented an earlier delivery under the rule in force there. If this rule was one which the law would uphold defendant in adhering to under the circumstances, a question of fact would arise on the evidence in the case at bar, as to whether so many other cars of corn were entitled to precedence over plaintiff's as to prevent delivery of the latter. As we have pointed out, there was evidence conducing to prove it was not other cars of corn entitled, under the rule, to be delivered on the elevator track ahead of plaintiff's, which prevented defendant from delivering the latter, but the unusual obstruction of the tracks in the yard by freight and passenger trains belonging to defendant and another railroad company. Seven cars which were shipped with some of

these and arrived at the same time, were turned over to the Elevator Company promptly, and there is no conclusive evidence that plaintiff's could not have been delivered as promptly. But in point of law, the alleged rule is no excuse for the delay in delivery. To begin with, the testimony conclusively shows the railroad people agreed to suspend the rule and put in plaintiff's cars ahead of others that had arrived before, and did this in some measure, thereby waiving the rule. Moreover, when we get to the facts relevant just here, we find they are these: The two railroad companies whose lines ended in the Nashville yards, had an arrangement with the Elevator Company by which the railroad companies might turn into the elevator to be stored and dried, any grain that arrived in the yards and was not called for by the consignees in a reasonable time. And the railroad companies under that arrangement were in the habit of turning into the elevator such carloads of grain in the order of their arrival in the yards; had, in fact, such a system or working rule, but there is nothing to show the Elevator Company was a party to prescribing it or had agreed in its contract with defendant or any other company to be bound by it and much less had plaintiff, for plaintiff knew nothing of the rule. How such a custom or arrangement entitled defendant or the Terminal Association, to refuse to comply with the demand of the Elevator Company for an immediate delivery to the latter of grain it had agreed with the owner to dry at once, we fail to perceive, and especially do we fail to perceive how defendant could be so entitled as against plaintiff. On what theory did defendant have a right to postpone delivery of cars which were called for promptly by the consignee, in favor of cars which the consignees had delayed unreasonably to call for, simply because defendant had a contract with the Eleevator Company that the latter should take charge of uncalled-for cars? Defendant was bound by law to deliver these cars in a reason-

able time, and if the consignee called for them at once, or within a reasonable time, manifestly it was no legal excuse for refusal to perform its duty to make a reasonable delivery, that there were other cars it wished to turn over to the Elevator Company first. Said company was under no contract with the owners or consignees of other cars which were awaiting delivery in the yards and had taken on itself no duty in regard to them, save the arrangement with defendant by which the grain in them might be stored in the elevator; whereas the Elevator Company had bound itself in a contract with plaintiff regarding these very cars, to clean the grain promptly, and if it chose to defend them at once, we do not see how the customary order of delivery justified a refusal to comply with the demand. As said, defendant did not refuse, but instead expedited the delivery over other cars which by the rule would have had priority. In point of law the supposed rule would have no force in this case, though insisted on as a defense. The only conclusion from the evidence about the delay in delivery is that defendant had congested its Nashville yards by receiving from outside points more grain for carriage to said city than could be handled there. Defendant knew of this condition when the cars in question were received and plaintiff did not. Moreover, defendant was expressly notified the corn was sent to Nashville to be dried and would require immediate handling to prevent it from spoiling. We do not find the least evidence to show plaintiff was to blame for the damage or to exonerate defendant. The Elevator Company did all in its power to avoid the loss, but its efforts were frustrated by defendant's failure to perform the duty to deliver the corn in a reasonable time; a failure due to no fault of the plaintiff, but either to defendant's not providing adequate terminal facilities or accepting more grain destined to Nashville than it could take care of at the time.

But it is said further defendant is to be excused because the bills of lading were not presented by the Elevator Company when the cars were ordered in. No doubt defendant might have refused to turn over any freight to the Elevator Company except on the presentation of bills of lading if it had chosen to do so; but to allow a defense for that reason in the present action would be to ignore the entire evidence, which shows that defendant and the Elevator Company had an arrangement pursuant to which grain was delivered without the tender of bills of lading; further, that defendant did not decline to turn over the cars in controversy because the bills of lading were not presented, and that they would have been presented if the delivery had been declined for non-presentation.

A point is made about lack of evidence of the value of the corn in the Nashville market; but we think there was abundant evidence on this issue.

The appeal is without merit and the judgment is affirmed. All concur.